# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6093 | **DATE** | 6/17/2003 |
| **CASE TITLE** | Abiola vs. Abubakar | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant's motion for summary judgment is granted in part and denied in part. The Court therefore dismisses plaintiffs' claims that arise from defendant's conduct while he was head of state. Defendant's motion is otherwise denied. Plaintiffs' motion to deem facts admitted (34-1) is denied; the Court directs defendant to respond to plaintiffs' request to admit facts within 30 days of this order. Abubakar's other pending motion is terminated (42-1).

(11) ■ [For further detail see order on the reverse side of the original minute order.] order attached to the original minute

| | No notices required, advised in open court. | |
|---|---|---|
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JUN 23 2003
date docketed

docketing deputy initials

date mailed notice

**Document Number**

50

OR   courtroom deputy's initials

CLERK, U.S. DISTRICT COURT
03 JUN 22 AM 10: 32
FILED

Date/Time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HAFSAT ABIOLA, individually and on )
behalf of the Estates of )
M.K.O. ABIOLA and )
ALHAJA KUDIRAT ABIOLA, )
ANTHONY ENAHORO, and )
ARTHUR NWANKWO, )
                 Plaintiffs, )
)
vs. )      Case No. 02 C 6093
)
GEN. ABDUSALAMI ABUBAKAR, )
)
                 Defendant. )

DOCKETED

JUN 2 3 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs are Nigerian nationals who, their complaint alleges, suffered grave human rights

abuses at the hands of Nigeria's military regime. Defendant, General Abdusalami Abubakar, was

a member of the military junta that ruled Nigeria from November 1993 to May 1999 and was

Nigeria's head of state for approximately the last year of the junta's reign. Plaintiffs contend that

Abubakar caused others to carry out the atrocities.

Plaintiffs contend that the Court has jurisdiction of the case under 28 U.S.C. § 1331, §

1350, and the doctrine of pendent jurisdiction. They allege violations of customary international

law, various international conventions and treaties, Nigerian law, and common law false

imprisonment, assault and battery, intentional infliction of emotional distress, conversion, and

wrongful death. The case is before the Court on Abubakar's motion for summary judgment. He

asserts lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non*

*conveniens* and challenges plaintiff Abiola's standing to bring this suit. For the reasons stated below, Abubakar's motion is granted in part, denied in part, and deferred in part.

On December 31, 1983, General Muhammed Buhari staged a military coup that overthrew Nigeria's democratically elected president and set off a series of military coups, forced abdications, and broken promises of a return to civilian rule. A parade of military rulers followed: in 1985, General Ibrahim Babangida overthrew General Buhari; after Babangida's ouster in August 1993, a civilian, Ernest Shonekan, led an interim military government; General Sani Abacha seized power three months later; and upon Abacha's sudden death, defendant Abubakar assumed control of the military regime on June 8, 1998. Unlike his predecessors, Abubakar carried out the long-promised transition to civilian government. A presidential election was held, and on May 29, 1999, former general Olusegun Obasanjo became Nigeria's first elected, civilian president in fifteen years.

Under the various military regimes between 1983 and 1999, the highest governmental body was the Provisional Ruling Council (PRC).[2] The PRC was composed of military officials and some civilians, and its chairmanship resided in whoever was currently the military leader. This body exercised both legislative and executive authority as well as judicial oversight. According to the complaint, the PRC ruled by decree, abolished democratic institutions, severely

---

[1]The following recitation adopts plaintiffs' version of the events but should not be considered as a finding regarding the accuracy of that version.

[2]This ruling council was known at different times as the Supreme Military Council, the Armed Forces Ruling Council, and the Provisional Ruling Council. The Court will refer to this body as the Provisional Ruling Council, its name under Generals Abacha and Abubakar.

curtailed civil liberties, and insulated its actions from judicial review.

Before his ascension to head of state, Abubakar was appointed the Chief of Defense Staff by General Babangida. In this role, Abubakar was a member of the PRC and a high ranking member of the military junta. The complaint alleges that between 1993 and 1998, Abubakar occupied the third highest military and political position in Nigeria. When he assumed power in 1998, he became head of state, Commander in Chief of the Nigerian armed forces, and Chairman of the PRC.

Plaintiff Hafsat Abiola is the daughter of Nigerian pro-democracy activists; she alleges that Abubakar is responsible for their deaths. On June 12, 1993, the Babangida regime held a presidential election as part of a promised return to civilian government. Abiola's father, M.K.O. Abiola, was a candidate in the election. Plaintiff contends that early returns showed that Abiola won the election, but the military regime nullified the election without releasing the official results. This led to protests and violent clashes between military forces and civilians. Abiola himself unsuccessfully challenged the election's nullification through the Nigerian court system and sought Nigerian and international support for the recognition of the election and its results. In June 1994 – during General Abacha's rule – Abiola declared himself the President of Nigeria. D.'s Br. in Support of Mot. for Summ. J. at 2. In August 1994, Abiola was arrested and charged with treason. Plaintiff alleges that while in prison, Abiola was kept under inhumane conditions, tortured, and denied access to lawyers, doctors, and family. He remained in prison until his death on July 9, 1998, roughly one month after defendant Abubakar had assumed control of the military regime. Plaintiff contends that her father died in Abubakar's executive offices, where he had been taken for a meeting, and that he "slumped and died . . . immediately after taking the tea

3

prepared for him by one of Defendant Abubakar's aides." Am. Compl. ¶ 23.

Plaintiff Abiola's mother, Alhaja Kudirat Abiola, was also a pro-democracy activist. After her husband's imprisonment, she embarked on a vocal campaign to free her husband and continued to call for the democratization of Nigeria. Plaintiff contends that Kudirat – and the international attention she attracted – infuriated the military regime. She allegedly received several menacing telephone calls warning her to refrain from criticizing the government. In June 1996, Kudirat was gunned down in her car. The complaint alleges that since the democratization of Nigeria in May 1999, her mother's killers have been arrested and confessed to carrying out the hit on orders of the PRC. The confessed killers and some members of the PRC have been charged with Kudirat's murder and are currently being tried. D.'s Br. in Support of Mot. for Summ. J. at 3 n.4.

Plaintiff Anthony Enahoro's political activism dates back to Nigeria's independence from Great Britain in 1960, in which he played a leading role. A former member of Nigeria's parliament, he more recently founded pro-democracy grass-roots organizations and spearheaded civil resistance to the military dictatorship. In August 1994, he was arrested and imprisoned. Under international pressure to free the seventy-year old man, he was released in December 1994. His four month detention was marked by harsh treatment. A diabetic, he was not provided insulin or offered any medical treatment. Following his release, Enahoro was granted political asylum by the United States, where he resided from 1995 until 2000, when he returned to Nigeria.

Plaintiff Arthur Nwankwo is a scholar and political activist who was arrested on June 3, 1998. The complaint alleges that upon his arrest, Nwankwo was stripped naked, flogged with a

4

cane, and carried away in a car trunk. The conditions of his confinement were severe; he was tortured and not permitted any clothes or covers. He was denied access to family, doctors, or legal counsel. He was released on August 24, 1998.

## DISCUSSION

### A. Subject Matter Jurisdiction

Abubakar maintains that this Court cannot exercise subject matter jurisdiction over this case because plaintiffs have not complied with certain statutory requirements and because he is entitled to immunity under the Foreign Sovereign Immunities Act or as a head of state.

#### 1. *Torture Victim Protection Act*

Plaintiffs' claims are brought pursuant to the alien Tort Claims Act, 28 U.S.C. § 1350. Abubakar asserts that this Court lacks subject matter jurisdiction because plaintiffs have failed to comply with the exhaustion-of-remedies requirement of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note. Although plaintiffs have not asserted a claim under the TVPA, Abubakar argues that the statute operates to bar our jurisdiction because, he contends, the TVPA governs "the extent of subject matter jurisdiction over foreign tortfeasors." D.'s Br. in Support of Mot. for Summ. J. at 4.

The TVPA creates liability under United States law where, under color of law "of any foreign nation," an alien or United States citizen is subject to torture or extrajudicial killing. 28 U.S.C. § 1350 note § 2(a). The TVPA requires that a plaintiff first exhaust "adequate and available remedies in the place in which the conduct occurred." *Id.* § 2(b). Abubakar contests this Court's jurisdiction because plaintiffs have an adequate forum in Nigerian courts and have not shown that they have exhausted their Nigerian remedies.

The first problem with Abubakar's argument is that the TVPA is not a jurisdictional statute, such that failure to comply with its requirements strips the Court of jurisdiction. *Cf. Al Odah v. United States*, 321 F.3d 1134, 1146 (D.C. Cir. 2003) ("The Torture Victim Act does not contain its own jurisdictional provision."). Rather, the statute simply provides a cause of action for torture and extrajudicial killings. H.R. Rep. No. 102-367, pt. 1, at 3 (1991). The TVPA does not supplant other causes of action that can be brought under the ATCA's jurisdictional umbrella. *Id.* at 4 ("[C]laims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered by section 1350 [the ATCA]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.").

Plaintiffs have brought this action pursuant to the ATCA, which confers federal jurisdiction for an action brought by an alien, for a tort, committed in violation of international law or a treaty to which the United States is a party. 28 U.S.C. § 1350; *see Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995). An alien plaintiff basing federal jurisdiction on the ATCA need not also assert a claim under, or comply with the terms of, the TVPA – all that is required is that she allege a tort committed in violation of international law, as plaintiffs here have done. In sum, because plaintiffs have not alleged a TVPA claim, the TVPA's exhaustion requirement does not apply.

2.      *Foreign Sovereign Immunity*

Abubakar claims that, as Nigeria's former head of state, he is entitled to immunity from suit under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C § 1602 *et seq.* If Abubakar is shielded by foreign sovereign immunity, this Court lacks subject matter jurisdiction

and must dismiss the claims against him: "the absence of sovereign immunity is a prerequisite to subject matter jurisdiction . . . ." *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985).

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," unless certain exceptions apply. 28 U.S.C. § 1604. Though the FSIA is "the sole basis for obtaining jurisdiction over a foreign state," *Argentine Republic v. Amerada Hess Shipping Crop.*, 488 U.S. 428, 439 (1989), the Act makes no mention of any immunity afforded to individuals. Abubakar maintains that it is well established that the FSIA applies to foreign officials and thus to heads of state who are sued for acts committed in their official capacities. This proposition, however, is far from settled. *See, e.g.*, *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) ("Because the FSIA makes no mention of heads-of-state, their legal status remains uncertain."); *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 293-94 (S.D.N.Y. 2001) ("The substantial disarray and division in the courts' practice following the enactment of the FSIA still prevails regrading the treatment accorded to head-of-state immunity . . . ."). In fact, courts divide on the question whether the FSIA's provisions cover heads of state. *See, e.g.*, *id.* ("While there is significant opinion supporting th[e] interpretation [that the FSIA's definition of "foreign state" extends to individuals], some courts addressing the exact question have squarely ruled otherwise, so that the proposition is by no means entirely settled.").

Under traditional common law, a foreign head of state was absolutely immune from suit in United States courts. The Supreme Court articulated this principle of customary international law in its 1812 decision, *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812). Although *The Schooner Exchange* held merely that an armed ship of a friendly foreign state was

exempt from the jurisdiction of United States courts, the decision "came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). Sovereign immunity was premised on the notions of comity and the equal dignity of nations. A ruler could not be seen to "degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another." *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. A head of state's immunity was premised on the concept that a foreign state and its ruler were one and the same; the "prince" was deemed to be the personification of the sovereign state. *The Schooner Exchange* reflects this conflation; throughout the opinion Chief Justice Marshall makes no distinction between the sovereign as state and the sovereign as ruler.

The conceptual identity of ruler and state "translated into a principle of immunity that, under customary international law, developed and was recognized as similarly unitary and coextensive." *Tachiona*, 169 F. Supp. 2d at 269. The result was that head-of-state immunity was not considered a concept distinct from the sovereign immunity of a foreign state. This identity is reflected in the absolute dearth of pre-1976 cases in which jurisdiction was asserted over a head of state personally, "separate and apart from the sovereign state the leader personified." *Id.* at 270 & n.29 (citing sources).

As the principles articulated in *The Schooner Exchange* evolved into a general doctrine of foreign sovereign immunity, the courts consistently "deferred to the decisions of the political branches – in particular, those of the Executive Branch – on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486. The Supreme Court articulated the rationale for such deference:

> [I]t is a guiding principle in determining whether a court should exercise or surrender its jurisdiction . . . , that the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs. "In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize.

*Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) (quoting *United States v. Lee*, 106 U.S. 196, 209 (1882)). Thus emerged a system under which the State Department determined the availability of sovereign immunity and the courts deferred to its decisions. *Verlinden*, 461 U.S. at 487.

Until 1952, the State Department "ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.* at 486. Then in 1952, the absolute form of immunity articulated in *The Schooner Exchange* was modified in the so-called Tate Letter. Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Philip B. Perlman, Acting Attorney General (May 19, 1952), *reprinted in Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682 (1976). The Tate Letter announced the State Department's adoption of the "restrictive" theory of foreign sovereign immunity. Under this theory, the State Department would recognize immunity only for a foreign sovereign's public acts, not its commercial or private activities. The Tate Letter explained that this shift in policy was motivated by the increasing practice of governments to engage in commercial activities, which made necessary "a practice which will enable persons doing business with [state enterprises] to have their rights determined in the courts." *Id.* The Tate Letter did not mention how immunity for heads of state would be altered, if at all. Notably, after the Tate Letter, courts continued to give conclusive deference to the State Department's

determinations, issued in the form of "suggestions of immunity."

The practical application of the restrictive theory proved troublesome, however. *Verlinden*, 461 U.S. at 487. Foreign states faced with litigation in United States courts often exerted diplomatic pressure on the State Department, and "[o]n occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Id.* Diplomatic pressures led to inconsistent, and sometimes embarrassing, outcomes. Equally problematic was that when the State Department did not intervene to request immunity, courts were left without objective rules for determining whether a state's assertion of immunity should be honored. Sovereign immunity determinations were thus "made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied." *Id.* at 488.

In 1976, Congress passed the FSIA to "free the Government from case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488 (quoting H.R. Rep. No. 94-1487, at 7 (1976) (hereinafter H.R. Rep.)) (alterations in original). The FSIA did so by codifying the restrictive theory and transferring immunity determinations based on the public/commercial distinction from the State Department to the courts. *See* 28 U.S.C. § 1602 (findings and declaration of purpose).

Neither the FSIA's text nor its legislative history addresses the issue of head-of-state immunity. Rather, like the Tate Letter, the FSIA manifests a preoccupation with the commercial activities of foreign states and a concern with granting "access to the courts in order to resolve ordinary legal disputes" that arise from their business transactions. H.R. Rep. at 6; *id.* at 7 ("In a

10

modern world where foreign state enterprises are every day participants in commercial activities, [the FSIA] is urgently needed legislation."); *Lafontant v. Aristide*, 844 F. Supp. 128, 137 (E.D.N.Y. 1994) ("[The FSIA] was crafted primarily to allow state-owned companies, which had proliferated in the communist world and in the developing countries, to be sued in United States courts in connection with their commercial activities."). In this vein, the Act's "Findings and declaration of purpose" states that

> [u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

28 U.S.C. § 1602. The FSIA provides that a "foreign *state*" is immune unless certain exceptions apply. *Id.* § 1604 (emphasis added). For example, the commercial exception provides that immunity is unavailable in actions

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.* § 1605(a)(2).

The FSIA's definition of "foreign state" noticeably omits heads of state. "Foreign state" is defined to include an "agency or instrumentality of a foreign state," which is further defined as "any *entity* (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b)

(emphasis added). The House Report's discussion of the definition of "foreign state" further underscores both the Act's commercial purpose as well as its applications to states *qua* states and state entities, not heads of state. The FSIA's reference to a foreign state's "agency or instrumentality" is meant to cover

> a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

H.R. Rep. at 16. Although the term "foreign state" is thus to be read broadly enough to cover such entities, there is no indication that heads of state are to be included in the definition. In fact, references in the legislative history suggest that the opposite is true. During Congressional deliberations on the FSIA, a witness from the Department of Justice described how the proposed legislation would enable suits against foreign state-owned enterprises – such as Lufthansa, West Germany's national airline. Notably, however, he emphasized, "Now we are not talking, Congressmen, in terms of permitting suit against the Chancellor of the Federal Republic. . . . That is an altogether different question." Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary, 93d Cong. 16 (1976) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice). Moreover, although the FSIA does not mention head-of-state immunity, the Act's legislative history indicates that it was not meant to affect diplomatic or consular immunity: "Section 1605(a)(5) would not govern suits against diplomatic or consular representatives but only suits against the foreign state." H.R. Rep. at 21.

It is logical to infer from the FSIA's legislative history and the omission of head of state

from the definition of "foreign state" that the FSIA was not intended to alter traditional immunity for heads of state. *See Tachiona*, 169 F. Supp. 2d at 277 ("With a legislative record devoid of any explicit contrary expression, a deliberate purpose to depart from generally prevalent international customs and practices as regards immunity for heads-of-state should not be ascribed to Congress."). This conclusion is further supported by the dearth of pre-FSIA cases dealing with head-of-state immunity; because – unlike foreign state immunity – the issue did not come up in litigation, it seems unlikely that Congress saw the need or intended to codify a rule for head-of-state immunity. *See id.* ("[I]t . . . would be an overstatement to say that Congress could have envisioned legislating to address a situation whose inherent problems, complexities and exact dimensions were not known or fully comprehended at the time.").[3]

Because the FSIA does not apply to heads of state, the pre-1976 suggestion of immunity procedure survives the statute's enactment with respect to heads of state. In reaching this

----

[3]The sovereign immunity concerns that were prevalent in 1976 also lend support to the inference that head-of-state immunity was not in the forefront of Congress's mind. As one district court has recently observed,

> [D]uring the fifteen years that spanned the issuance of the Tate Letter and the enactment of the FSIA the bulk of sovereign immunity litigation recorded, not only in United States courts but in other countries, entailed commercial disputes involving foreign state public entities. In a compilation of sovereign immunity decisions covering this period, the State Department reported only two instances in which immunity determinations related specifically to suits brought against heads-of-state.

*See Tachiona*, 169 F. Supp. 2d at 275 (footnotes omitted) (citing Jerrold L. Mallory, Note, Resolving Confusion Over Head of State Immunity: The Defined Rights of Kings, 86 Colum. L. Rev. 169, 176 n.26 (1986) (citing Sovereign Immunity Decisions of the Department of State (May 1952 - Jan. 1977), 1977 Dig. U.S. Prac. Int'l L. 1017)). One commentator of the day, remarking on the emergence in the international community of "complex and detailed rules" for denying sovereign immunity for states' commercial ventures, noted that "None of this large and complex body of international law has been drawn up with the position of heads of state in mind." Satow's Guide to Diplomatic Practice 9 (Lord Gore-Booth ed., 5th ed. 1979).

determination, we join several courts who have come to this conclusion. *See United States v. Noriega*, 117 F. 3d 1206, 1212 (11th Cir. 1997) ("Because the FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases, such as this one, only pursuant to the principles and procedures outlines in *The Schooner Exchange* and its progeny. As a result, this court must look to the Executive Branch for direction on the propriety of Noriega's immunity claim."); *Leutwyler v. Office of her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001) (not applying the FSIA to Queen Rania and dismissing all claims against her because the Government filed a Suggestion of Immunity); *Tachion*a, 169 F. Supp. 2d at 290 ("[T]he Executive Branch's role in determinations of head-of-state immunity was not affected by the passage of the FSIA."); *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1119 (D.D.C. 1996) ("[T]he enactment of the FSIA was not intended to affect the power of the State Department . . . to assert immunity for heads of state or for diplomatic and consular personnel."); *Lafontant*, 844 F. Supp. at 137 ("The language and legislative history of the FSIA, as well as case law, support the proposition that the pre-1976 suggestion of immunity procedure survives the FSIA with respect to heads-of-state."); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 382 (S.D. Tex. 1994) (dismissing claims against King Fahd because the United States intervened to acknowledge his status as head of state), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) (unpublished table decision); *Kline v. Kaneko*, 535 N.Y.S.2d 303, 304 (N.Y. Sup. Ct. 1988) ("The FSIA made no change . . . in the State Department's power to suggest immunity for foreign heads of state . . . ."; dismissing suit against wife of Mexican president because State Department suggested immunity). *See also Kadic*, 70 F.3d at 248 (declining to extend head-of-state immunity to defendant where the Executive Branch refused to

acknowledge immunity).

The Court acknowledges the line of cases cited by Abubakar, largely from the Ninth Circuit, that have found that the FSIA abrogated the pre-1976 approach to immunity for heads of state. In *Chuidian v. Philippine National Bank*, 912 F.2d 1095 (9th Cir. 1990), the Ninth Circuit held that the FSIA's definition of "agency or instrumentality" can "fairly be read to include individuals sued in their official capacity." *Id.* at 1103. Yet even some court decisions that, following *Chuidian*, apply the FSIA to determine whether a foreign official is entitled to immunity nevertheless defer to the State Department's suggestions where a head of state is concerned. *See, e.g., First Am. Corp.*, 948 F. Supp. 1107; *Leutwyler*, 184 F. Supp. 2d 277. Defendant also cites *Boshnjaku v. Federal Republic of Yugoslavia*, No. 01 C 4608, 2002 WL 1575067 (N.D. Ill. July 18, 2002), a decision by this Court, in which we held (relying on *Chuidian*) that a former head of state qualified as an "agency or instrumentality of a foreign state" and was therefore immune under the FSIA. Upon reconsideration of the issue and for the reasons stated above, however, the Court concludes that the FSIA does not apply to heads of state.

We therefore turn to a determination of whether Abubakar is entitled to immunity from this lawsuit. Because the FSIA did not alter head-of-state immunity, common law immunity – and the practice of following the State Department's immunity determinations – remains intact with respect to heads of state. The State Department, however, has not intervened to suggest immunity for Abubakar. In the absence of guidance from the Executive Branch, "courts may decide for themselves whether all the requisites of immunity exist." *Republic of Mexico*, 324 U.S. at 34-35; *Noriega*, 117 F.3d at 1212; *In re Doe*, 860 F.2d at 45.

At common law, heads of state enjoyed absolute immunity from all suits, except perhaps those arising from a head of state's personal commercial ventures. *Cf. The Schooner Exchange,* 11 U.S. (7 Cranch) at 145 (suggesting that a head of state involved in a private venture might not enjoy immunity). And even were the Tate Letter deemed to apply to heads of state, its restrictions would not apply in this case, as the plaintiffs' claims do not arise from Abubakar's business transactions. Plaintiffs contend that the nature of the wrongs they allege eliminates any immunity that might otherwise shield Abubakar. However, the opposite seems to be true. First, as just mentioned, under the common law heads of state enjoyed absolute immunity from suit, regardless of the nature of the allegations. Second, as discussed above, foreign sovereign immunity and head of state immunity were not conceptually distinct doctrines until the FSIA carved out certain immunity exceptions for foreign states. A head of state, like the state itself, can therefore be understood to enjoy any immunity that states retain after the FSIA's enactment. The Supreme Court has held that foreign states are immune from suits for unlawful detention and torture – "abuse of the power of [a state's] police" – because "however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Saudi Arabia v. Nelson,* 507 U.S. 349, 361 (1993). *A fortiori,* the same is true for a head of state.

Plaintiffs also argue that Abubakar should not be immune because head-of-state immunity only protects sitting heads of state. The immunity to be afforded a former head of state is an unsettled issue; there is no square holding that head-of-state immunity for acts committed during one's tenure as ruler disappears when a leader steps down. The Second Circuit has stated in dicta that "there is respectable authority for denying head-of-state immunity to former heads-

of-state." *In re Doe*, 860 F.2d at 45. However, the cases the court cited in support of this proposition suggest merely that a former head of state may not be entitled to immunity 1) for his private acts, *see The Schooner Exchange*, 11 U.S. (7 Cranch) at 145; *Republic of Philippines v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986) (stating in dicta that head-of-state immunity may not "go[] so far as to render a former head of state immune as regards his *private* acts" (emphasis added)), or 2) when the foreign state waives the immunity of its former leader, *see In re Grand Jury Proceedings*, 817 F.2d 1108, 1111 (4th Cir. 1987). Neither scenario is present here. Moreover, the cornerstones of foreign sovereign immunity, comity and the mutual dignity of nations, are not implicated by denying immunity in the types of matters cited in *Doe* – in the first scenario because the head of state is being sued for acts taken as a private person and in the second because the foreign state disavows immunity for its former leader. In this Court's estimation, the rationale for head-of-state immunity is no less implicated when a former head of state is sued in a United States court for acts committed while head of state than it is when a sitting head of state is sued.

In the absence of any doctrine restricting a head of state's immunity for the type of conduct alleged in the complaint or a denial of immunity from the State Department, the Court determines that Abubakar is entitled to head-of-state immunity for his acts during the period that he was Nigeria's head of state. Abubakar asserts, and plaintiffs concede, that he was Nigeria's head of state from June 8, 1998 to May 29, 1999. He is immune from suit only for acts committed during that period. *See, e.g., Tachiona*, 169 F. Supp. 2d at 289 ("[C]ourts uniformly have accepted the claim [of immunity] as to heads-of-state and heads-of-government."); *El-Hadad v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69, 82 n.10 (D.D.C. 1999)

(declining to extend head-of-state immunity "to cover all agents of the head of state"), *rev'd in part on other grounds*, 216 F.3d 29 (D.C. Cir. 2000); *First American Corp. v. Al-Nahyan*, 948 F. Supp. 1107 (D.D.C.1996) (declining to recognize head of state immunity of Minister of Defense of the United Arab Emirates); *Republic of Philippines v. Marcos*, 665 F. Supp. 793, 797 (N.D. Cal. 1987) (stating that the "two traditional bases for a recognition or grant of head-of-state immunity" are a defendant's position as either sovereign or foreign minister). We therefore turn to the complaint to determine if immunity is available with respect to each plaintiff's allegations.

M.K.O. Abiola was imprisoned in June 1994 and died on July 9, 1998. Abubakar is entitled to immunity only for any acts committed during the last month of M.K.O.'s life, the period when he was Nigeria's head of state. Plaintiff Abiola's claims are dismissed for lack of subject matter jurisdiction to the extent they arise from M.K.O. Abiola's treatment between June 8, 1998 and July 9, 1998. Defendant's motion as to Abiola's claims concerning her father is otherwise denied.

With respect to plaintiff Abiola's claims arising from the murder of her mother, Alhaja Kudirat Abiola, Abubakar is not entitled to immunity because the murder occurred in June 1996, two years before he became head of state. Similarly, Abubakar lacks immunity with regard to plaintiff Enahoro's claims, which arise from his imprisonment in 1994.

Plaintiff Nwankwo's claims arise from his imprisonment between June 3, 1998 and August 24, 1998. Apart from the five days he was held before Abubakar's ascension to power, Nwankwo's claims fall squarely during Abubakar's tenure as head of state. Abubakar is entitled to immunity with respect to Nwankwo's claims arising from Abubakar's acts between June 8, 1998 and August 24, 1998.

18

## B. Personal Jurisdiction

Abubakar maintains that this Court cannot exercise personal jurisdiction over him. Although he was personally served with summons while visiting Chicago, he argues that he does not have the required minimum contacts with the forum to render this Court's jurisdiction consistent with traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Shaffer v. Heitner*, 433 U.S. 186 (1977). *But see Burnham v. Superior Court*, 495 U.S. 604, 619 (plurality opinion) ("[J]urisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'"). However, as this Court has stated in a previous order, *see* Order of Jan. 7, 2003, Abubakar waived any defect in personal jurisdiction by answering the complaint without challenging personal jurisdiction by way of an affirmative defense or a Rule 12(b) motion. Fed. R. Civ. P. 12(h)(1)(B) ("A defense of lack of jurisdiction over the person . . . is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading . . . .); Fed. R. Civ. P. 12(b) ("A motion making any of these defenses [including lack of personal jurisdiction] shall be made before pleading if a further pleading is permitted."); *Linc Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921 (7th Cir. 1997).

## C. *Forum non Conveniens*

Abubakar argues that this action should be dismissed on the grounds of *forum non conveniens*. Although he styles his challenge as one of "improper venue based on *forum non conveniens*," Abubakar is not actually challenging venue, which, like personal jurisdiction, would be waived because he did not raise it in his answer or a motion to dismiss. Fed. R. Civ. P.

12(h)(1)(B); Fed. R. Civ. P. 12(b). Under the doctrine of *forum non conveniens*, a trial court has discretion to dismiss a suit over which it has jurisdiction when an alternative forum exists "if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Co., Inc.*, 108 F.3d 799, 802 (7th Cir. 1997).

Because "a plaintiff's choice of forum should rarely be disturbed," defendants face a significant hurdle when moving for dismissal on *forum non conveniens* grounds. *Cf. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981) (noting that district courts have "more discretion to transfer under [28 U.S.C.] § 1404(a) than . . . to dismiss on grounds of *forum non conveniens*"). The defendant's threshold burden is to demonstrate that an adequate alternative forum exists. *Kamel*, 108 F.3d at 802 ("As a practical matter, it makes little sense to broach the subject of *forum non conveniens* unless an adequate alternative forum is available to hear the case.") (citing *Piper*, 454 U.S. at 254). "This is a two-part inquiry: availability and adequacy." *Id.* An alternative forum is available if all parties "are amenable to process and are within the forum's jurisdiction." *Id.* at 803. An alternative forum is adequate "when the parties will not be deprived of all remedies or treated unfairly." *Id.* (citing *Piper*, 454 U.S. at 255).

Abubakar has not met his threshold burden of demonstrating that an adequate alternative forum exists. Abubakar argues only that all parties are amenable to suit in Nigerian courts; he makes no attempt to show the Court that plaintiffs have an adequate remedy in Nigeria and will be treated fairly there. A motion for dismissal on *forum non conveniens* grounds raises special concerns when the claims against the defendant are brought under the ATCA for torture and other human rights abuses. Dismissal "can represent a huge setback in a plaintiff's efforts to seek reparations for acts of torture" due to "the enormous difficulty of bringing suits to vindicate

20

such abuses." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105, 106 (2d Cir. 2000). For example, in the complaint, plaintiffs intimate that the Nigerian courts were to some extent complicit with the military regime. *See, e.g.*, Am. Compl. ¶¶ 9, 11, 21. Though this may no longer be the case, Abubakar bears the burden of demonstrating that dismissal would leave plaintiffs with an adequate remedy. *Cf.* H.R. Rep. No. 102-367, pt. 1, at 3 (1991) ("Judicial protections against flagrant human rights violations are often least effective in those countries where such abuses are most prevalent. A state that practices torture and summary execution is not one that adheres to the rule of law. The general collapse of democratic institutions characteristic of countries scourged by massive violations of fundamental rights rarely leaves the judiciary intact."). In light of his failure to do so, and mindful that "the plaintiff's choice of forum should rarely be disturbed," the Court declines to exercise its discretion to dismiss this action on *forum non conveniens* grounds. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

## D.  Plaintiff Abiola's Standing

Abubakar contends that plaintiff Abiola lacks standing to bring this suit on behalf of her parents' estates, as she is only one of numerous heirs and has not shown that she is the estates' administrator. This is a significant issue. In federal court, "[e]very action [must] be presented in the name of the real party in interest." Fed. R. Civ. P 17(a). *See generally, Wilson v. Sunstrand Corp.*, No. 99 C 6944, 2002 WL 99745 (N.D. Ill. Jan. 25, 2002). But because this issue does not implicate subject matter jurisdiction (the issue we had directed Abubakar to address in the present motion), Abiola has not yet addressed it. The Court directs her to do so forthwith by filing a memorandum within fourteen days of this order. Defendant's reply is due seven days thereafter. Both memoranda must comply with the page limitations in the Local Rules.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment [41-1, 45-1] is granted in part and denied in part. Because he was Nigeria's head of state between June 8, 1998 and May 29, 1999, Abubakar is entitled to sovereign immunity with respect to any claims that arise from his acts during this period. The Court therefore dismisses plaintiffs' claims that arise from defendant's conduct while he was head of state. Defendant's motion is otherwise denied, except with regard to the issue of Abiola's capacity to sue, which the Court will address after receiving the parties' supplemental memoranda on the issue. Plaintiffs' motion to deem facts admitted [34-1] is denied; the Court directs defendant to respond to plaintiffs' request to admit facts within 30 days of this order. Abubakar's other pending motion [42-1] is terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 17, 2003