**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HAFSAT ABIOLA, ANTHONY ENAHORO, and ARTHUR NWANKWO, Plaintiffs, vs. ABDUSALAMI ABUBAKAR, Defendant. | Case No. 02 C 6093 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The defendant, General Abdusalami Abubakar, is a former member of the military regime that ruled Nigeria from November 1993 to May 1999. The plaintiffs are Nigerian citizens who were allegedly tortured, or whose parents were allegedly tortured, at Abubakar's behest because they criticized the military regime while it was in power. They have sued Abubakar under the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, and the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350 note § 2(a). In this decision, the Court undertakes the unenviable task of determining whether the Nigerian legal system affords the plaintiffs a remedy for their alleged injuries or whether that legal system is ineffective and inadequate.

We refer to our task as unenviable because the TVPA's requirements place the Court in an unusually uncomfortable position. Congress has, in the TVPA, conferred on this country's judiciary the determination of the adequacy of legal remedies in another country. A court in this country is unlikely to be in a good position effectively to gauge the adequacy of another country's judicial system – particularly when we are dependent (as we always are, in an

adversary system of justice) upon the ability of counsel to marshal and present evidence that adequately addresses the issue.

Second, the TVPA essentially allows another country's citizens to sue their own leaders in this country's courts. Though victims of wrongful imprisonment and torture by dictatorial regimes present appealing cases for judicial intervention, imagine if the shoe were on the other foot. What would be the reaction of our government if an individual – either a United States citizen or a non-citizen – were to obtain a judgment in some other country against our Nation's leaders on the basis that he lacked an adequate legal remedy here for a claim of wrongful detention or mistreatment while in custody? One may reasonably question whether it is wise to confer on the judicial branch the determination of an issue that potentially could affect the conduct of this Nation's foreign policy.[1]

Our assessment of the wisdom of Congress' adoption of the ATCA and TVPA, however, can have no bearing on our decision in this case. A court is required to enforce the law as it is, not as one might like it to be. The TVPA directs courts to address whether the plaintiff had an adequate and available remedy in the country where the alleged misconduct occurred. Though this Court is uncomfortable dealing with this issue, we must abide by Congress' directive.

**Facts**

According to the plaintiffs' complaint, from 1993 to 1998, General Abubakar attempted to silence Chief Anthony Enahoro, Arthur Nwankwo, and Hafsat Abiola's parents, Chief M.K.O. Abiola and Alhaja Kudirat Abiola – all vocal advocates of democratic reform in Nigeria –

---

[1] We note that although the government filed a brief as *amicus curiae* in the earlier appeal in this case to express its views regarding whether the ATCA creates a private right of action, it has not asked to express its views on the question now before the Court.

through a regular dose of imprisonment and torture. Abubakar allegedly had Chief Abiola imprisoned in 1994 and kept him detained until he died in custody in 1998; imprisoned Enahoro, a diabetic, for four months in 1994 without providing him insulin or proper medical treatment; had Alhaja Kudirat Abiola assassinated in 1996; and caused Nwankwo to be arrested, detained, and flogged over a period of more than two months in 1998.

In 1999, Abubakar, who by then had become Nigeria's head of state, instituted democratic elections in Nigeria, and the military regime came to an end. On February 22, 2001, the plaintiffs filed this lawsuit in the United States, seeking damages under the ATCA. Abubakar defended the lawsuit by arguing that he was immune from suit under the Foreign Sovereign Immunities Act and that the Court lacked subject matter jurisdiction under the TVPA because plaintiffs had not exhausted their remedies abroad. The Court ruled that Abubakar was entitled to immunity for the acts he allegedly committed while he was head of state but lacked immunity for all other claims. *See Abiola v. Abubakar*, 267 F. Supp. 2d 907, 916-917 (N.D. Ill. 2003). The Court rejected, however, Abubakar's argument concerning subject matter jurisdiction. *Id.* at 910. On interlocutory appeal, the Seventh Circuit affirmed our ruling on the sovereign immunity issue but reversed our ruling on subject matter jurisdiction, citing the Supreme Court's intervening decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). The Seventh Circuit held that the TVPA, along with its attendant exhaustion requirement, provides the only cause of action for aliens seeking compensation for acts of torture abroad. *See Enaharo v. Abubakar*, 408 F.3d 877, 885 (7th Cir. 2005).

On remand, Abubakar moved for summary judgment on the exhaustion issue. On November 8, 2005, the Court denied Abubakar's motion, concluding that the plaintiffs had

raised a genuine issue of material fact by presenting State Department reports suggesting that the Nigerian judiciary provided an inadequate forum for their claims. *See Abiola v. Abubakar*, No. 02 C 6093, 2005 WL 3050607, *3 (N.D. Ill. Nov. 8, 2005).

On May 4 and May 5, 2006, the Court held an evidentiary hearing on the availability of remedies in Nigeria. Abubakar offered evidence that once Nigeria became democratic in 1999, the plaintiffs could have sued Abubakar in Nigeria under the human rights provision of the 1999 Nigerian Constitution or under the African Charter of Human and People's Rights. In response, plaintiffs offered evidence that the statute of limitations on such actions had run before plaintiffs could have brought an effective suit, i.e., before Nigeria became democratic. Plaintiffs also presented evidence that Nigerian courts are subject to corruption and that court judgments, even today, are regularly ignored by the executive branch.

Abubakar's evidence primarily consisted of testimony from his expert witness, Adebayo Adaralegbe, a Nigerian lawyer who has nearly eighteen years of legal experience but whose area of expertise is commercial law. May 4, 2006 Tr. at 16-17. Adaralegbe testified that during the 1980s and 1990s, the military regime suspended many provisions of the 1979 Nigerian Constitution by enacting various decrees. *Id.* at 80. Decree 1 suspended those portions of the 1979 Constitution that gave citizens a right to seek redress for human rights violations, and Decree 2 prevented an individual from seeking judicial recourse when he or she was detained by the military. May 4, 2006 Tr. at 80.

Adaralegbe testified that to make way for the 1999 Constitution, the military regime, as it was leaving power, issued a final decree that repealed all of the previous decrees. *Id.* at 81. The 1999 Constitution then reestablished many of the rights that the earlier decrees had eliminated.

4

*Id.* at 81, 91. According to Adaralegbe, the 1999 Constitution has a retroactive effect and allows a plaintiff to sue under its human rights provision for violations that occurred prior to its adoption. *Id.* at 91. In support of this interpretation, Adaralegbe pointed to section 46 of Chapter IV of the Nigerian Constitution, which says, "Any person who alleges that any of the provisions of [the chapter of the constitution dealing with fundamental rights] has been, is being or likely to be contravened in any State in relation to him may apply to a High Court in that State for redress." May 5, 2006 Tr. at 133. He said that the statute of limitations for bringing suits under this provision is one year, though courts may extend that period if the plaintiff accounts for his delay to the satisfaction of the judge. *Id.* at 167-68 (citing Ex. 16 at 522 (*Tafida v. Alhaji Sa'adu Abubakar* (1991))).

Adaralegbe also testified that the African Charter, a treaty that was signed by Nigeria in the 1990s, provides a second vehicle for individuals seeking compensation for past human rights violations. He pointed to a 2000 Nigerian Supreme Court case captioned *Abacha v. Fawehinmi*, where the court held that the decrees issued by the military, particularly Decree 2 and Decree 12, did not alter or abridge the rights under the African Charter, including the right to be free from government-sponsored torture. *See* Def. Ex. 11 at 268.

Adaralegbe also testified that a victim of human rights violations could sue under the Nigerian common law of torts and that the statute of limitations on such suits is six years if brought in the Nigerian state of Lagos. May 5, 2006 Tr. at 113.

Lastly, Adaralegbe discussed the United States Department of State country reports on Nigeria issued over the past several years and expressed concern that the language in the reports remained the same or similar from year to year. *Id.* Adaralegbe pointed out that the reports

5

discussing the judiciary often begin and end with a practically identical paragraph, which, according to him, suggests that the reports were not the product of an in-depth analysis but, rather, a recycling of the reports from year to year. *Id.* The report from 2005 reads in part as follows:

> Although the law provides for an independent judiciary, the judicial branch remained susceptible to executive and legislative branch pressure. Political leaders influenced the judiciary, particularly at the state and local levels. Understaffing, underfunding, inefficiency, and corruption continued to prevent the judiciary from functioning adequately. Citizens encountered long delays and frequent requests from judicial officials for small bribes to expedite cases.

United States Department of State, Country Reports on Human Rights Practices, Nigeria, 2005 (March 2006).

The plaintiffs' evidence also primarily consisted of expert testimony. Their expert was Femi Falana, a Nigerian lawyer who has practiced for twenty-four years in the area of human rights law. In Nigeria, he represented two of the plaintiffs in this case, M.K.O. Abiola and Enaharo, while they were detained by the military regime. He himself was also detained on two occasions for several months each time, because of his work as a human rights lawyer. Falana has authored a book on human rights enforcement in Nigeria.

Falana agreed with Adaralegbe on a number of points. He agreed that a lawsuit brought under the African Charter or the human rights provision of the 1999 Nigerian Constitution ordinarily carries with it a one year statute of limitations, which the court may extend if it determines that the plaintiff has properly accounted for his or her delay. May 25, 2006 Tr. at 308. He also agreed that rights under the African Charter, including the right to be free from government sponsored torture, were unaffected by the decrees of the military regime. *Id.* at 267. Finally, he agreed that the plaintiff could sue the defendant under the law of tort and that the

6

statute of limitations on such an action is ordinarily six years. *Id.* at 309. Falana testified, however, that when a plaintiff challenges the acts of a government official in a lawsuit, regardless of whether the suit is brought under the Nigerian Constitution, the common law, or the African Charter, the statute of limitations for the lawsuit is shortened to three months under Nigeria's Public Officers Protection Act (POPA). *Id.*

Though the POPA would seem particularly relevant to their case, plaintiffs did not submit a copy of the POPA or any Nigerian case applying the POPA. Rather, they quoted a Nigerian court's discussion of the POPA without attaching the case or the statute. Pls. Post-Hearing Brief at 15. The defendants, however, did submit a case from the Nigerian Court of Appeals that discusses the POPA. *See* Ex. 16 at 522 (*Tafida v. Alhaji Sa'adu Abubakar* (1991)). That case quotes the POPA as follows:

> Where any action, prosecution or other proceeding is commenced against any person for any act done in pursuance or execution or intended execution of any Law or of any public duty or authority . . . the action, prosecution or proceeding shall not lie or be instituted unless it is commenced within three months next after the act, neglect, or default complained of.

*Id.* The defendants presented no evidence suggesting the POPA would not apply to claims of the type brought by the plaintiffs in this case.

Falana also testified, contrary to Adaralegbe, that the 1999 Constitution does not apply retroactively. *Id.* at 204. Falana supported his interpretation by citing section 6(6)(d) of the 1999 Constitution, which reads, "judicial powers vested in accordance with the foregoing provisions of this section shall not . . . extend to any action or proceeding relating to any existing law made on or after 15th January of 1966 for determining any issue or question as to the competence of any authority or person to make any such law." *Id.* at 204. He testified that this

provision does more than simply prohibit inquiry into the legislative competence of authorities existing prior to 1999. *Id.* at 249. Rather, Falana insisted that it prohibits any lawsuit seeking compensation for acts committed by the military regime. *Id.* 214, 249.

On this point, Falana's and Adaralegbe's testimony is in direct conflict. The Court, however, finds Adaralegbe's testimony more persuasive. As Abubakar argues, the constitutional provision cited by Falana, which refers to inquiries into competency "to make . . . law," appears to concern the adoption of laws, not acts taken by executive authorities in carrying out the law, or as claimed in this case, outside the framework of the rule of law. In addition, Adaralegbe cited case law supporting his interpretation of this provision, and Falana did not. *See Nangibo v. Okafor* at 83-85 (2003) ("What section 6(6)(d) of the Constitution was meant to do or achieve was to oust the jurisdiction of the courts in determining any issue or question as to the legislative competence of any authority or person to promulgate any law.").

Falana also testified that the military regime would have ignored any judgment awarded to the plaintiffs before May 1999. *Id.* at 201. The Court found this testimony credible and persuasive. Falana recounted numerous cases in which the plaintiff obtained a judgment, and the government simply refused to comply. *Id.* at 252, 254, 255. Falana also suggested that a judgment awarded after May 1999 might have been ignored, citing recent criticism of the executive branch for failing to enforce judgments. *Id.* at 197. Finally, he testified that the United States Department Country Reports on Nigeria are accurate and reliable. *Id.* at 219-20.

## Discussion

The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture shall, in a civil action, be

8

liable for damages to that individual." 28 U.S.C. § 1350 § note 2a. The statute contains an exhaustion requirement, which provides, "A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." *Id.* Every court that has applied this exhaustion requirement looked for guidance to the report of the Senate committee that considered the TVPA. *See Jean v. Dorelien,* 431 F.3d 776, 781-82 (11th Cir. 2005); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996); *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1357-58 (S.D. Fla. 2003); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 C 8386, 2002 WL 319887, *17 (S.D.N.Y. 2002); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1347 n.30 (N.D. Ga. 2002); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1197 n.6 (S.D.N.Y. 1996); *Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995). Though the Court ordinarily might question the authoritativeness of legislative history of this type, there is no basis to do so in this case: both the plaintiffs and Abubakar agree that the Senate report articulates the proper burden of proof.

The Senate report says that initiation of a lawsuit under the TVPA "will be virtually prima facia case evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred." *See* S. Rep. No. 102-249, at 9-10 (1991), *reprinted in* 1991 WL 258662. The report goes on to state that the exhaustion requirement, consistent with general principles of international law and United States common law, requires the defendant to raise the issue of non-exhaustion of remedies as an affirmative defense and to point to remedies abroad that have not been exhausted. *Id.* The burden then shifts to the plaintiff "to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or

9

obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant." *Id.* at 10.

The first two steps of the Senate report's burden shifting mechanism are familiar and easy to follow. Traditional rules recognize that non-exhaustion is an affirmative defense that the defendant must initially raise and prove. *See, e.g., Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Once the defendant makes such a showing, it is traditionally the plaintiff's burden to prove that pursuing other remedies would be futile. *See, e.g., Honig v. Doe*, 484 U.S. 305, 325-29 (1988); *Greenfield Mils, Inc. v. Macklin*, 361 F.3d 934, 958 (7th Cir. 2004) (holding, in Fifth Amendment takings context, that plaintiff bears burden of proving that administrative remedies are futile); *In Home Health, Inc. v. Shalala*, 272 F.3d 554, 560 (8th Cir. 2001) (same in Medicare reimbursement context); *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 756 (7th Cir. 1999) (same in ERISA context); *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (same in habeas context).

Though the Senate report says the TVPA follows traditional exhaustion principles, it is not completely clear what the report means when it says that the ultimate burden of proof and persuasion remains on the defendants. The Court has been unable to find cases involving exhaustion of remedies that discuss this principle. Ordinarily, as discussed above, the defendant has the burden of pleading and proving that available remedies are unexhausted, and the plaintiff has the burden of proving futility. It is unclear whether the TVPA requires defendant to prove something else in addition to the presence of unexhausted remedies. Whatever the Senate report means, however, we do not believe that it alters the traditional rule – particularly relevant in this case – that the plaintiffs bear the burden of proving the futility of unexhausted remedies once the defendant shows that remedies abroad have not been exhausted. The Senate report, upon which

10

so many courts have relied, cites *Honig* for the proposition that the TVPA's exhaustion requirement is consistent with common-law principles. In *Honig*, the Supreme Court said that the party raising the futility issue is required to prove it. *Honig*, 484 U.S. at 327.

Having set out the legal standards applicable to this case, the Court proceeds to apply the law to the facts. Abubakar has met his initial burden of proving that the plaintiffs failed to exhaust available remedies before filing suit in the United States. Abubakar presented evidence that after the military regime ended, the plaintiffs could have filed suit under the human rights provision of the 1999 Constitution, the African Charter, or the common law of torts. Though the statute of limitations on the first two types of actions is ordinarily one year, Abubakar presented evidence that this period can be extended by the trial court judge if the plaintiff accounts for his delay. Indeed, even Falana, the plaintiff's expert, recognized in his book on Nigerian human rights law that such extensions are possible. *See* Def. Ex. 15A at 86.

Plaintiffs have, however, satisfied their burden of proving futility. Specifically, they have established that the POPA required them to sue Abubakar, who at all relevant times was a public officer in Nigeria, within three months of the accrual of their causes of action. Plaintiffs' causes of action accrued on or before August 24, 1998. Three months from that date, the military regime was still in power. In short, plaintiffs' Nigerian causes of action expired before democracy was restored in Nigeria and before there is any basis in the evidence to believe that a judicial remedy was anything other than illusory.

Any legal remedy available to the plaintiffs within the period required by the POPA, that is, during the period of military rule, would have been futile. Plaintiffs established that the military regime's decrees barred Nigerian courts from questioning acts undertaken by the

11

military regime.  And even if a courageous judge might have proceeded despite the military decrees, plaintiffs established that the military routinely ignored any occasional judgments that may have been issued against the government.

To summarize, Nigerian law (the POPA) would have required the plaintiffs to bring suit during a period when, the evidence overwhelmingly showed, judicial remedies were ineffective and futile.  Defendant has not argued, and has presented no evidence, that any provision of Nigerian law during or after the period of the military regime would have allowed a court to ignore or extend the POPA's three month limit on filing suit.  And even if one could assume (despite the absence of any evidence) that this time limit is subject to extension, defendant has offered no evidence that a Nigerian court could have or would have done so in a case of this type.  The Court is unwilling to engage in such speculation in the absence of any supporting evidence.

Even if the POPA would not apply to the plaintiffs' claims (though the evidence provides no basis for such a belief), the Department of State Country Reports from 2000-2005 sufficiently cast doubt on the adequacy of a Nigerian judicial forum.  The reports, including the most recent one issued in 2006, specifically state that the judicial system does not function adequately because of corruption and underfunding.  The Court sympathizes with Abubakar's argument that the Country Reports, at least on their face, do not evidence a thorough analysis – statistical or otherwise – of the state of the Nigerian judicial system.  Nevertheless, federal courts routinely recognize that these reports are evidence of a country's stance on human rights.  *See, e.g., Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006); *Giday v. Gonzales*, 434 F.3d 543, 556 (7th Cir. 2006); *Wiwa*, 2002 WL 319887 at *17.  We cannot ignore this precedent.

12

The Seventh Circuit has cautioned against over-relying on Country Reports, particularly because it is difficult for parties to question their conclusions. *See Zheng v. Gonzales*, 409 F.3d 804, 811 (7th Cir. 2005). In this case, however, Abubakar has hardly attempted to question the reports' conclusions with evidence other than his expert's unsupported assertions. Indeed, Abubakar has not pointed to a single instance in which an individual sued a public official for violations of his or her human rights and actually succeeded in enforcing a judgment. Based on the evidence presented to the Court, we believe that the conclusions contained in the Country Reports satisfy plaintiffs' burden, particularly because the TVPA's exhaustion requirement is not meant to impose a "prohibitively stringent condition precedent to recovery under the statute." *See Xuncax*, 886 F. Supp. at 178. This is, however, an alternative basis for our holding; as discussed above, plaintiffs satisfied their burden of proving futility even without relying on the Country Reports.

**Conclusion**

On the evidence presented to this Court, the plaintiffs have satisfied their burden of proving that Nigeria did not and does not provide them an adequate forum for their lawsuit. The case is set for a status hearing on July 13, 2006 at 9:30 a.m. The parties are directed to file, by July 10, 2006, a joint status report regarding the discovery that has been and remains to be conducted and proposing deadlines for the completion of any remaining fact and expert discovery.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 27, 2006