**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HAFSAT ABIOLA, ET AL. | : | |
| | : | |
| Plaintiffs, | : | No.: 02-cv-06093 |
| | : | |
| V. | : Hon. Judge Matthew F. Kennelly |
| | : | |
| GENERAL ABDULSALAMI ABUBAKAR | : | |
| | : | |
| Defendant. | : | |

D**EFENDANT'S SUPPLEMENTARY MEMORANDUM IN SUPPOR OF MOTION TO RECONSIDER**

COMES NOW, Defendant General Abdulsalami Abubakar, though counsel, and hereby files a Supplementary Memorandum in Support of his Motion to Reconsider, and as grounds therefor states as follows:

1. On March 19, 2007, this Court, in a ruling issued pursuant to plaintiffs' Motion for Sanctions, ordered General Abubakar to appear on April 13, 2007, for his deposition in the Court's premises.

2. Prior to plaintiffs filing their motion, the Government of the Federal Republic of Nigeria had commenced efforts to prevent defendant from submitting to discovery request on the basis that to do so would violate Nigeria's Official Secrets Act, (Nigerian Statute) which is a law in Nigeria that prohibits the disclosure of certain classified information[1]. The Nigerian Statute carries severe penalties including a long jail term for any person violators.[2]

---

[1] It is the universal practice of all nations of the world to designate certain information about the functions of the sovereign state, which it considers privileged and protected on grounds of national security. In all such cases, the Government protects such information from disclosure by enacting laws that impose penalties. Whenever such information is raised in a trial before the courts, the judges of the affected state will hear evidence in camera to determine the eligibility of the information for protection. This privilege hearing in camera is done by the judicial officer of the affected state who enjoys, as is generally the case, security clearances, and thus duly appointed in accordance with the constitution of the affected state and who does not bear allegiance to a foreign power. In the case of Nigeria, this Honorable Court is cannot hear evidence in camera for the purpose of that law.

3. On March 5, 2007, Nigerian Government filed a petition at the Federal High Court of Nigeria, sitting in Abuja, the capital city of Nigeria. The Government's purpose for its petition was to restrain Abubakar, who was named as a co-respondent, from "transmitting to any persons or group thereof in any place within and outside Nigeria, whether or not pursuant to Court Order or before any Court of law outside Nigeria any details and/or information relating to his involvement in, membership of, participation in or information discovered, received, gathered, disclosed or obtained from, during or at any meetings minutes of meetings, discussions and events or occurrences ....."

4. On March 28, 2007, the Honorable Justice B. F. M. Nyanko (Justice of the Federal High Court), granted a restraining order in favor of the Nigerian Government and against General Abubakar.

5. As a result of the Nigerian Statute, and particularly the Order of the Honorable Justice Nyanko, Abubakar is prohibited at the pain of jeopardy from submitting to deposition in Chicago, given the scope of the questions which plaintiffs have indicated they would ask defendant in the course of discovery.

**The Nigerian Statute is a Blocking Statute:**

6. Scenario for a blocking statute arises whenever there exists a statute which prevents a party against whom a discovery obligation lies from submitting to discovery. It is a blocking statute because the statute is usually outside the source of law, which the court is ordinarily bound to consider in the normal course of its general jurisdiction. This Court is ordinarily not bound by Nigerian law and Nigerian law would ordinarily not govern discovery in this Court.

---

[2] Counsel has ordered a copy of the Nigeria's Official Secrets Act. It is on its way, but has not arrived at the office of counsel. A copy thereof will be forwarded to the Court as soon as it arrives.

However, the Nigerian statute does prevent defendant from submitting to discovery in this Court, given the nature of this case before this Court. The effect of a blocking statute is extensively treated in a long list of cases, such as *Graco, Inc. v. Kremlin, Inc.,* 558 F.Supp. 188 (N.D.Ill.1982). In re Anschuetz & Co., GmbH C.A.La.,1985, the District Court held that district court could allow German corporation to make available any documents and witnesses in Germany if that was more convenient to parties without implicating German sovereignty, or, if German corporation was not voluntarily forthcoming in Germany, court could order production of documents and examination of witnesses to occur in United States to avoid any infringement upon German sovereignty. Similarly, defendant is willing to be deposed in Nigeria, and this Court can order it.

7. It is not disputed that a district court "has the *power* to impose discovery under the Federal Rules of Civil procedure when it has personal jurisdiction over the foreign party." *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, n. 4, 107 S.Ct. 2542, 2546 n. 4, 96 L.Ed.2d 461 (1987) (Blackmun, J., concurring in part and dissenting in part) (citing *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 204-06, 78 S.Ct. 1087, 1091-93, 2 L.Ed.2d 1255 (1958)). Moreover, in *Societe Internationale* the Supreme Court specifically held that the interdictions of the Swiss bank secrecy law do not bar a conclusion that a foreign entity has "control" over documents within the meaning of Fed.R.Civ.P. 34. The critical question is whether this court should, as a matter of discretion, issue such an order in view of the Nigeria secrecy objections raised by defendant and in the face of the order of the Nigerian court. Defendant urges this Court to exercise its jurisdiction in his favor.

8. In *Trade Development Bank v. Continental Insurance Co.,* 469 F.2d 35 (2d Cir.1972), the Court of Appeals found that Judge Pollack had not abused his discretion in not ordering a

Swiss bank to identify customer accounts in violation of Swiss bank secrecy law. Other courts which have considered this question agree that the Second Circuit Court of Appeals has, in line with other circuits, now adopted a more flexible approach than that reflected in the early cases. *See SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 114-17 (S.D.N.Y.1981); *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 29 (S.D.N.Y.1984); *United States v. Vetco Inc.,* 691 F.2d 1281, 1288 n. 8 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

9. Focusing on the other boundary of a court's discretion in this context, plaintiffs have argued that a court need not consider the effect of foreign law in deciding whether to issue an order compelling discovery. The Court of Appeals has consistently considered foreign law implications in reviewing both orders to compel and orders imposing sanctions. *See, e.g., Trade Development Bank,* 469 F.2d at 39-42 (refusal to issue order to compel); *First National City Bank,* 396 F.2d at 900-05 (imposition of civil contempt sanctions); *see also, e.g., United States v. Davis,* 767 F.2d 1025, 1033-36 (2d Cir.1985) (issuance of order compelling bank customer's consent to disclosure). Other courts which have considered the matter agree that in the Second Circuit foreign law is to be considered at the order stage. *See Banca Della Svizzera,* 92 F.R.D. at 117 n. 3; *Remington Products, Inc. v. N. Am. Philips Corp.,* 107 F.R.D. 642, 648 n. 4 (D.Conn.1985)

10. In deciding motions such as this, the courts have used an analysis derived from Section 40 of the Restatement (Second) of the Foreign Relations Law of the United States (1965) in evaluating the propriety of an order directing the production of information or documents located abroad where such production would violate the law of the state in which the documents are located. *United States v. Davis,* 767 F.2d at 1033-34 (citing subpoena

cases); *see also Trade Development Bank,* 469 F.2d at 41; *First National City Bank,* 396 F.2d at 902.

11. Section 40 provides: **Limitations on Exercise of Enforcement Jurisdiction**

"Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as (a) vital national interests of each of the states, (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person, (c) the extent to which the required conduct is to take place in the territory of the other state, (d) the nationality of the person, and (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state."

12. Courts have characterized the first two factors-the competing interests of the countries involved and the hardship imposed by compliance-as far more important in the balancing test than the last three, *see Banca Della Svizzera,* 92 F.R.D. at 119; *Remington Products,* 107 F.R.D. at 652; *Garpeg, Ltd. v. United States,* 583 F.Supp. 789, 795 (S.D.N.Y.1984), and a reading of the pertinent Second Circuit cases bears this out, *see First National City Bank,* 396 F.2d at 897 ("The obvious, albeit troublesome, requirement for us is to balance the national interests of the United States and Germany and to give appropriate weight to the hardship, if any, Citibank will suffer.")

13. At least two other factors have been found to be significant in addition to those mentioned above. The first is the importance of the information and documents requested to the conduct of the litigation. See *Trade Development Bank,* 469 F.2d at 41 ("relative unimportance of the information ... in the present proceeding was entitled to be considered"); In *Re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1146, 1154-55 (N.D.Ill.1979) ("normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence ... should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation"); *Vetco,* 691

F.2d at 1290 ("no showing that the documents are cumulative of records already produced"); *but see Compagnie Francaise,* 105 F.R.D. at 32 n. 8 (declining to consider the importance of the requested documents to the requesting party's case)[3].

**14.** The second additional factor is the good or bad faith of the party resisting discovery. This factor was first articulated in *Societe Internationale,* in which the Supreme Court considered a Swiss company's good faith efforts to comply with a production order in determining whether the imposition of the sanction of dismissal was appropriate. 357 U.S. at 208-13, 78 S.Ct. at 1093-96. Courts in this circuit have considered a resisting party's good faith efforts to comply with discovery at the order stage as well as the sanctions stage. *See, e.g., First National City Bank,* 396 F.2d at 900 & n. 8, 905 (sanctions stage); *Compagnie Francaise,* 105 F.R.D. at 31-32 (order stage). Another aspect of a resisting party's good faith which is scrutinized by courts in this area is whether a party's inability to produce documents as a result of foreign law prohibitions was fostered by its own conduct prior to the commencement of the litigation. Although this aspect of good faith did not figure prominently in *Societe Internationale,* the Supreme Court stated there that a party's having "deliberately courted legal impediments to production ..., if supported by the facts, would have a vital bearing" on its ruling. 357 U.S. at 208-09, 78 S.Ct. at 1093-94; *see also Banca Della Svizzera,* 92 F.R.D. at 117-19 (applying pre-litigation conduct good faith factor at order stage).

**The Order of the Honorable Justice Nyanko Confirms the Nigerian Statute:**

15. Usually, a court faced with the claim that a blocking statute exists, has a primary duty of determining the scope of such a blocking statute and whether it actually prohibits the resisting party from submitting to discovery. This is often a matter of interpretation, usually

---

[3] There should not be any difference between a document request or deposition.

conducted before any court in the foreign country has taken a position on the application of the statute in question. In this case, it would seem that the Order of the Honorable Justice Nyanko (Exhibit A) has resolved any doubts about the scope or application of the Nigerian statute. The order leaves no doubts that in addition to the penalties specified under the statute, defendant would be faced with contempt of the court were he to proceed to Chicago to submit to deposition as commanded by this Court. The legal analysis of the order is not much different from that of the blocking statute, except to the extent that the order interprets the blocking statute, thus giving it a distinct clarity and finality. This is because *Legis interpretatio legis vim obtinet* (The interpretation of law obtains the force of law).

### **Defendant's Assertion of the Nigerian Statute is in Good Faith:**

16. A few occasions have arisen in the course of this trial where this Court has, by various statements, suggested that defendant is less than candid and sincere. The most recurrent of these occasions is in connection with the question of whether Abubakar was served with the summons or not. Abubakar stated that he was not. But in view of the existence of a photograph in which defendant was reading the summons, the Court found defendant's denial of service as a lack of candor and even outright dishonesty. And this has formed a backbone to the Court's scatting comments and dim view of the defendant.

17. Whereas the position of the Court would be understandable in the ordinary person's context of a picture speaking louder than words, the court setting is not an ordinary person's setting. The fact, as shocking as it has appeared, is that defendant has a legitimate basis for his denial. For the first time, in the course of this trial, defendant's good faith has become a cornerstone for the relief he is seeking. As such, it has become important to dispel once and for ever that backbone upon which the court has doubted defendant's honesty and sincerity –

the issue of service. Defendant will do so by recounting the circumstances in which the appearance of service of summons occurred.[4]

18. In February 2001, when Abubakar received a copy of the summons in this case, which was issued by the District of Michigan, Abubakar was attending an inaugural event held in his honor by Chicago State University (the University). It was his first official visit to the United States since handing over power to the present Nigerian President.

19. Security was tight at the University event venue because certain persons and activists, including a group led by Mr. Kayode Oladele, attorney for the plaintiffs, had organized protests at the venue of the event.[5] Exhibit B shows the protesting spirit which pervaded the university venue on February 20, 2001 and which justified the security precautions taken by the Chicago police. Oladele and his men were protesting against several issues including the fact that there were military governments in Nigeria and they had assumed that the event at Chicago State University would be attended by other past Heads of State of Nigeria, such as General Ibrahim Babangida, General Buhari and Mr. Ernest Shonekan. These activists bore various grudges against these past Nigerian leaders. Contrary to the calculations of the activists and protesters, the event had no connection with any other past head of State of Nigeria, aside from General Abubakar.

20. Apparently, Mr. Oladele had arrived at the protest ground not only with a placard, but also with a summons he had, being a lawyer, obtained from the Michigan District. The

---

[4] The purpose of raising the issue of service at this point is only to address what defense perceives to be the foundation of the skepticisms of this court toward defendant.

[5] From the very beginning, the defendant has repeatedly urged this court to take into consideration the role of the actors in this case. Oladele is the real litigant, and not a lawyer. The plaintiffs counsel have repeatedly lied to this court. Unfortunately, this Court, not having the level of judicial notice of Nigerian facts, as would a Nigerian court or would this court for an American-located facts, this Court has been limited in its ability to overcome the incredible lies being spewed by the plaintiffs. However, Nigeria public and institutions, including the Nigerian courts are not similarly limited. Exhibit B, a protest letter co-authored by Oladele shows the role of Oladele and his view before this case was filed, and it explains why this case was filed.

original action to which the summons related was filed against all the past leaders of Nigeria mentioned above. And the action was filed on behalf of the several presumed activists in Nigeria as plaintiffs, clearly without prior approval of those plaintiffs. (This will explain why the first amendment of the complaint. It was a case of wrongly-estimated plaintiffs and defendants).

21. Mr. Oladele armed one of his co-agitators and member of his activist group with the summons. He sent him to breach the security line and find any means whatsoever to get the summons to Abubakar. The co-agitator scaled a window into the venue of the event. The event was attended by dignitaries such United Nations representatives, officials of both the United States and State of Illinois Governments, notable leaders of the American civil society such as Rev. Jesse Jackson, etc. Immediately Abubakar finished presenting his address to the audience, Mr. Oladele's designated co-agitator walked up to Abubakar and made to handed him a document (which was the summons). With a practiced ease, Abubakar's aide who stood next to him throughout the period stepped in and collected the document from the protester[6]. All this happened at the time that several other persons were lined up to shake the hand of General Abubakar.

22. About an hour afterwards, the aide handed Abubakar back the summons because, according to the aide, who had then read the title of the document, it seemed out of place. It was at this point that Abubakar looked at the document with his wife seated next to him. The same activist who handed the document to Abubakar's aide was waiting for this moment to

---

[6] Oladele's agent came close enough to Abubakar and even shook Abubakar's hand. The precision and approach is comparable to that used by a suicide bomber, except that this person had no bombs and was only an activist with clearly a mischievous intent.

take a photograph of Abubakar reading the summons[7]. At this time, Abubakar assumed that this was some practical joke, given that the protesters outside the venue were displaying all kind of documents and leaflets and placards against past Nigerian leaders. Abubakar handed the document back to the aide. Later than afternoon, Abubakar mentioned the document to the then Nigerian Ambassador to the United States, Ambassador Jubril Aminu, and the question was whether it could be true that someone actually did file a lawsuit.

23. Around 5:30PM that same day, Ambassador Aminu ran into Defendant's counsel undersigned. The Ambassador asked counsel if indeed a lawsuit was filed against Abubakar. And counsel replied "since no court papers had been served upon the General, it must be a joke". At this time counsel was unaware of the fact of the summons that Abubakar saw at the venue of the event earlier in the day.

24. On the basis of all that transpired, Abubakar returned to Nigeria unaware of whether there was indeed a lawsuit or not. On the other hand, Mr. Oladele and his group, triumphant over the fact that they managed to sneak into the venue with the summons and even managed to take a photograph of the General reading the summons, immediately began to make a lot of political noises in Nigeria. Within three (3) days after Abubakar returned to Nigeria, it became clear that indeed a lawsuit was filed in Michigan District.

25. Following from the above sequence of events, Abubakar advised his lawyers (then Kevin Duckworth, Esquire) that he was not aware that a lawsuit was filed against him until after he got back to Nigeria. (This statement remains true in the context). Abubakar's lawyers repeated this statement nearly word-for-word in their pleadings before Honorable Judge Friedman in the Michigan District. Plaintiffs then submitted their photograph, for the first

---

[7] Does the photograph constitute evidence of service? No, it shouldn't have been for a court of law. Indeed, the court failed to ask the critical question: why would Abubakar be reading a summons against himself in a public gathering?

time, to the Honorable Judge Friedman. With a photograph of Abubakar holding the summons, it was easy, albeit naively, for the Judge to infer that Abubakar's statement as to how he became aware of the lawsuit was untrue. This perception of lack of candor was inherited by this Court. Yet, Abubakar's statement was honest and logically accurate.

26. It is necessary to recount the above events for three reasons. (a) First, there is need for the Court to re-examine its assessment of General Abubakar's candor and understand that those several negative remarks based on the summons and the photograph are actually wrong and have inflicted inadvertent unfairness on Abubakar; (b) Second, there is need for the Court to understand why the issue of service has not rested and will probably survive the proceedings in this Court; and (c) Thirdly, it is important for the Court to understand the way Nigerians and Nigerian institutions, including Nigerian Courts, view the conduct of the plaintiffs and this case.[8]

**<u>Abubakar's Choices:</u>**

27.  Regardless of the consequences, defendant had the choice of ignoring the summons, as this Court has acknowledged[9]. Yet, as an international statesman, he chose to pursue an approach that would not be viewed as being disrespectful to the American judicial authority. This he has shown by defending this case since the past six (6) years, rather than ignoring it. Abubakar took the following cooperative steps:

> (i)    He answered the interrogatories, objecting only to those questions that implicated the Nigerian statute.

---

[8]  In the minds of Nigerians, what dominates is the fact that Oladele and his men breached the security line and got close enough to the point where they could have killed General Abubakar if that was their intent. For this Court to repeatedly disparage defendant for denying that service occurred under these circumstance is an outrage in Nigeria, which will not go away for a long time.

[9] This Court in its order (Doc. No. ) acknowledged that defendant could have chosen not to respond to the summons, but did not. This acknowledgment should negate any conclusion that defendant does not wish to cooperate with the Court.

(ii)   He answered the request to admit facts, objecting only to those requests that implicated the Nigerian statute.

(iii)  He participated for over six (6) hours in the mediation ordered by the Court of Appeals, Case No. 03-3089.

28. It is simply not borne out by evidence that Abubakar does not want to cooperate or that his assertion of the blocking statute is in bad faith. Stressing the important of the conduct of the party resisting discovery, the court in *Minpeco, S.A. v. Conticommodity Services, Inc. S.D.N.Y.,1987, page 6,* held thus:

"To sum up:  the principal factors to consider in deciding this motion to compel are (1) the competing interests of the nations whose laws are in conflict, (2) the hardship of compliance on the party or witness from whom discovery is sought, (3) the importance to the litigation of the information and documents requested, and (4) the good faith of the party resisting discovery."

### Abubakar wanted to submit to deposition as far back as in 2002:

29. As defendant prepared to submit to deposition in 2002, defendant had to notify the Government of Nigeria and to obtain clearance. He had to take this step because by virtue of the Nigerian Constitution defendant is a member of the National Security Council. He does not travel from Nigeria without notification to and, sometimes, clearance from, the Nigerian Government. The reason is that given his status, the President of Nigeria could call upon him at any time in the case of a national emergency or crisis. He therefore reasonably and routinely informs the Nigerian presidency of his movements outside the country. Having known the reasons for Abubakar's plan to travel overseas for deposition, the Government of Nigeria got interested in knowing more about the case. Apprehensive that the range of questions raised in the discovery would violate the Nigeria's Official Secrets Act, the Government ordered defendant not to submit to deposition.

30. The Government of Nigeria also took steps to obtain the support of the United States Government in this matter. This was how the U.S. Justice Department in collaboration with the U.S. State Department filed an Amicus brief in support of Abubakar during the appeal before the 7th Circuit. Nigerian Government and defendant assumed that the intervention of U.S. Government was going to lead to a smoother resolution of the case.

31. Still feeling exposed to the possibility of sanctions by this Court in connection with discovery, Abubakar notified the Government of Nigeria in December of 2006 of his intension to submit to deposition, if this Court was to order him. It was at this point that the Nigerian Government felt the need to take out a court injunction against Abubakar.

32. With the present court order in Nigeria, Abubakar will face extreme consequences if he were to disobey the Nigerian Court order by submitting to deposition in Chicago.

## Failure to Submit to Deposition as Ordered by this Court is Beyond Abubakar's Control

33. Where an act is beyond the control of a party to a lawsuit, the Court ought not to sanction such a party for not carrying out such an impossible act. The wisdom behind this is stressed in the Latin maxim – *impossibilium nulla obligatio est* (there is no obligation to do impossible things).

### Additional Consideration

34. For this Court to proceed to sanction Abubakar under these circumstances will not advance the justice of this case. Rather, it will tend to create unnecessary diplomatic row between Nigeria and the United States.

35. It is also clear that the Nigerian courts have jurisdiction over this case and over all the parties in this case. All the counsel of record are members of the Nigerian Bar and are subject to the disciplinary jurisdiction of that Bar and its Courts. There is no doubt that this case has

invoked deep passions among Nigerians in and outside Nigeria, and the reason for this is not because Abubakar is the defendant. Rather, it is because the trial is occurring in Chicago. Even Abubakar's opponents are shocked at the venue of this trial. Also, seriously speaking, the American public will be shocked to know that the taxes they paid are being used to trial this Nigerian case.

36. At the same time, defendant understands that this Court cannot at this stage walk away from this case and leave this dispute unresolved. In consideration of this, defendant is willing to enter into an undertaking to ensure that plaintiffs are able to bring this action in Nigeria within the next twelve (12) months if they so desire and if the Court could issue a stay in the interim. For instance, defendant is ready to concede jurisdiction to Nigerian courts and will waive any claims to statute of limitation. Therefore, defendant urges this court thus: instead of issuing a sanction which will regrettably not be complied with, given the position of the Nigerian Courts, this Court should fashion out an order or arrangement to enable plaintiffs to bring their case in Nigerian courts. The possibilities exist for this kind of arrangement and defendant is willing and ready to pursue it, should the court so agree.

WHEREFORE, Defendant Abubakar respectfully requests the Court to grant his motion to reconsider and to make such other order as the court may deem fit and just in the circumstance.

Respectfully submitted May 1, 2007

ECU ASSOCIATES, PC

By:

_____/s/_____
Ephraim Emeka Ugwuonye, Esquire
850 Sligo Avenue, Suite 400
Silver Spring, MD 20910

Tel: 301-588-9315
Fax: 301-588-9318


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this pleading has been served via the CM/ECF system upon the Plaintiffs' attorneys of record.

_____/s/_____
Ephraim Emeka Ugwuonye, Esquire